IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TONIA INGRAM<br>4223 Winding Waters Terrace<br>Upper Marlboro, MD 20772,<br><br>Plaintiff,<br><br>v.<br><br>DISTRICT OF COLUMBIA CHILD &<br>FAMILY SERVICES AGENCY<br>200 I Street SE<br>Washington, DC 20003,<br><br>Defendant. | Case: 1:18-cv-01598   **JURY DEMAND**<br>Assigned To : Unassigned<br>Assign. Date : 7/5/2018<br>Description: Employ. Discrim. **(H-DECK)**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT
### (Disability Discrimination & Retaliation)

Pursuant to Federal Rule of Civil Procedure Rule 3, Plaintiff Tonia Ingram (hereinafter "Plaintiff"), by her undersigned attorney, hereby files her Complaint.

### I. JURISDICTION AND VENUE

1. This Court has jurisdiction of the subject matter of this complaint pursuant to 28 U.S.C. § 1331, because this is an action arising under the laws of the United States, specifically, Title 42 of the Americans with Disabilities Act of 1990 (ADA), as amended, 42 U.S.C. § 12101.

2. On or about March 23, 2018, Plaintiff filed a formal Charge of Discrimination in EEOC No. 570-2018-01576 with the EEOC.

3. The EEOC accepted Plaintiff's formal Charge of Discrimination as timely.

4. Defendant was duly notified about Plaintiff's administrative complaints and was given an opportunity to respond to her allegations.

5. On April 5, 2018, the EEOC made a decision on the merits of Plaintiff's

discrimination claims and issued her a Notice of Right to Sue, by regular mail.

6. This Complaint is filed within 90 days after Plaintiff received the Notice of Right to Sue on her EEOC complaint.

7. Plaintiff has exhausted the administrative remedies available to her under the ADA, and all conditions precedent have occurred or been performed.

8. Venue in this District and in this Division is appropriate pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(c), as Defendant District of Columbia Child & Family Services Agency (hereinafter "Defendant") has extensive and deliberate contacts in this District and Division, including an office at 200 I Street SE, Washington, DC 20003, at which Plaintiff worked.

## II. THE PARTIES

9. Plaintiff is a resident of Maryland and a former employee of Defendant.

10. Defendant is a political subdivision of the District of Columbia government created pursuant to DC law, which employees more than 500 employees.

## III. FACTS CENTRAL TO PLAINTIFF'S CLAIMS

11. Plaintiff suffers from severe anxiety. Plaintiff began to have symptoms of anxiety in the 1990s, but she was formally diagnosed in the 2000s. Plaintiff has been prescribed anxiety medication in the past and is currently taking medication. Plaintiff also seeks mental health counseling as needed.

12. Defendant's HR department was not formally aware of Plaintiff's condition, but Plaintiff's supervisors, previous supervisors, and colleagues were all aware of her condition.

13. Plaintiff holds a Master's Degree of Social Work and Bachelor's Degree of Community Health Education. Plaintiff is a Licensed Clinical Social Worker in Washington D.C.

14. Plaintiff has worked in the field of social work for approximately fifteen years.

15. In or around September 2011, Defendant Hired Plaintiff as an Investigator Social Worker.

16. In this position, Plaintiff assessed and investigated allegations of neglect and physical and sexual assault of children living in the District of Columbia.

17. Plaintiff received several awards and honors for her work in this position including:

   a. *The Hero Award*, presented by Brenda Donald in 2014, for providing excellent service to clients;

   b. A story in the *Washington Post* about the above-mentioned award;

   c. Invitation to participate on the *Rapid Response Team* in 2015 to tackle cases that were backlogged.

18. In 2016, Defendant promoted Plaintiff to the position of Supervisory Social Worker. Trista Davis, former Program Administrator of CPS, made the decision to promote Plaintiff, and she was notified via email by Cherlitheia Irving (hereinafter "Irving"), Program Manager.

19. In this position, Plaintiff was responsible for supervising a team of social workers serving children and families of the District of Columbia in the areas of abuse and neglect. Plaintiff managed and supervised a team of four Child Protective Social Workers. Plaintiff's supervisor was Irving.

20. Plaintiff's relationship with Irving prior to November 2017 was cordial. Plaintiff only worked peripherally with Irving; on paper, Irving was Plaintiff's assigned supervisor, however Plaintiff did not report to her regularly. Irving advised Plaintiff to seek consultation with another Program Manager because Irving supervised too many people to advise Plaintiff.

21. In or around November 2017, Plaintiff began to meet with Irving more regularly, and the relationship began to sour.

22. In or around December 2017, Irving gave Plaintiff a satisfactory performance evaluation. Irving indicated that Plaintiff's evaluation was better than others. Irving stated that Plaintiff was a leader and held my social workers accountable. In addition, Irving said that Plaintiff's communication skills had improved significantly, and the following year Plaintiff's evaluation would be significantly higher. Irving also sent an email to Plaintiff's team, congratulating them for having no backlog.

23. Shortly after completion of the December 2017 performance evaluation, Irving began harassing Plaintiff.

24. On December 11, 2017, the severe harassment from Irving began. Plaintiff was working on an immediate case (hereinafter referred to as the Gillis Case). Plaintiff provided Irving with a notification that the children may have to be removed from the parents in the Gillis Case. It appeared that the children had suffered serious physical abuse at the hands of their parents.

25. Irving immediately doubted Plaintiff's judgment about removal and ordered Plaintiff to forward her the pictures of the alleged abuse in the Gillis Case. After forwarding the pictures to Irving, Plaintiff returned to Irving's office and Irving brought in another Program Manager, Rayna Bailey-Smith to discuss the Gillis Case.

26. In this discussion, Irving said that the child in the picture looked like "he got his ass whooped." However, Irving still doubted Plaintiff's judgment and said Plaintiff needed to contact the previous social worker on the Gillis case. Smith-Bailey also said the decision to remove the child cannot be made based on one photo. Plaintiff responded by reiterating that there was no final decision yet, and she had several procedural steps to complete before making a final decision, such as reviewing the case history.

27. Irving then accused Plaintiff of failure to listen and failure to accept constructive criticism. Irving's comments were made in a harsh and condescending manner.

28. Plaintiff then attempted to leave Irving's office because her anxiety was beginning to affect her ability to respond to Irving's questions and criticism. On Plaintiff's way out of Irving's office, Irving convinced Smith-Bailey to agree with her that she hadn't been rude to Plaintiff. Irving further said to Plaintiff that if there was an issue with her conduct that Plaintiff should file a formal complaint with HR. Plaintiff did not immediately file a complaint because she was too busy with substantive work.

29. Ultimately, both parents were arrested for Second Degree Child Cruelty, and both children were removed in the Gillis Case.

30. Social Worker Rebstock, who worked under the supervision of Plaintiff and was the lead social worker on the Gillis Case, informed Plaintiff that the night of the removal, Irving called her several times because Irving continued to doubt Plaintiff's judgment.

31. At this point, Plaintiff first confided in Elizabeth Muffoletto (hereinafter "Muffoletto"), Program Administrator, about the treatment she was receiving from Irving.

32. Plaintiff believes that Irving's harassment was directed at her because of her anxiety. Plaintiff felt targeted by Irving because she used Plaintiff's anxiety as a means of controlling the narrative of Plaintiff's work, conduct, and performance. Irving made it appear to others in the organization that Plaintiff was no longer able to make sound clinical decisions due to her anxiety; Irving mocked Plaintiff by making statements to upper management that she was "running around acting anxious" when responding to an immediate case. Plaintiff was harassed by Irving when she would speak quickly or have difficulty communicating under stress.

33. In addition, Irving falsely accused Plaintiff of harassing and chastising workers because she suffers from anxiety. Irving also falsely accused Plaintiff of calling workers after hours as if she were harassing them to close out cases.

34. Irving's aggressive and intimidating behavior created a hostile and offensive environment for Plaintiff and the social workers under her supervision. Irving made it difficult for Plaintiff to perform effectively as a supervisor. Irving believed that she could harass Plaintiff without repercussions because of Plaintiff's anxiety; upper management would not correct Irving's behavior nor support Plaintiff because Irving manipulated them and use Plaintiff's anxiety to justify her behavior.

35. As a result of this continuing harassment, Plaintiff reached out to Muffoletto on December 13, 2017, to request a transfer to a different Program Manager. Muffoletto is Irving's supervisor.

36. In this meeting, Plaintiff cried as she recounted the details of the harassment caused by Irving. Muffoletto advised Plaintiff to write it up a formal complaint to avoid insubordination.

37. Plaintiff noted that there was no altercation, rather there was a difference in opinion and a discussion with respect to the Gillis Case. Plaintiff stated that this was the first time she had a removal case with Irving as supervisor, it was messy, and Irving was unsupportive. Plaintiff also explained how Irving is not always available and does not hold required weekly supervision.

38. Muffoletto said Plaintiff was acting paranoid and that her thoughts were all over the place. Plaintiff responded and said that was because of her anxiety; it was getting bad and Plaintiff was having difficulties articulating her thoughts.

39. Plaintiff asked if Muffoletto could accommodate her by moving her from Irving's supervision, to Ellen Walker's (another Program Manager) team, and Muffoletto refused. She questioned why Plaintiff wanted to be moved and Plaintiff explained that she performs better under Walker because Walker was supportive. Muffoletto provided no explanation for the denial of Plaintiff's request.

40. Muffoletto asked if Plaintiff wanted her to speak with Irving, but Plaintiff declined, stating that she was scared. Plaintiff said that Irving should not be confronted because Irving retaliates against those who are disloyal. Muffoletto then acknowledged that Irving can be aggressive, and this was not the first time she received complaints about Irving's behavior.

41. Plaintiff volunteered talk to Irving herself and Muffoletto asked Plaintiff to keep her posted. Muffoletto asked if something like this happened before, and Plaintiff said that Irving was always an unpredictable bully, but it had never been this bad. Irving has a history of blaming things on Plaintiff and apologizing after the fact.

42. After the meeting, Plaintiff sent the complaint to Irving and copied Muffoletto.

43. On January 12, 2018, Plaintiff had a supervision session with Irving. Irving asked Plaintiff about her social workers' cases and Plaintiff explained that she had just returned from leave and holiday, so Plaintiff had not recently had supervision sessions with her social wokers.

44. Nevertheless, Plaintiff met with her social workers briefly before her meeting with Irving to discuss pending cases. Irving then pressed Plaintiff on the details of her workers' pending matters. Plaintiff reiterated that she was returning from leave and that her workers properly handled cases in her absence.

45. Irving then falsely accused Plaintiff of rolling her eyes. Plaintiff became nervous because Irving never questioned her like this in the past. Irving then called in Muffoletto to can

7

"observe [Plaintiff's] behavior." Plaintiff asked Irving why she was behaving that way and why the supervision sessions could not be productive under Irving.

46. Plaintiff began to get up from her seat, and Irving yelled at Plaintiff to sit down. Nevertheless, Plaintiff let to get her supervision folder. When Plaintiff returned, Muffoletto was in Irving's office.

47. Muffoletto then began to question Plaintiff and asked, "why [Plaintiff] exited Irving's office," and Plaintiff responded that she needed her supervision folder. Muffoletto said that Plaintiff already had the folder, and Plaintiff said she did not, she previously had a notebook.

48. Irving then lied to Muffoletto by saying that she told Plaintiff that if Plaintiff left her office it would be insubordination. Plaintiff explained to Muffoletto that Irving instead yelled at plaintiff to sit back down in the chair without mention of insubordination. Irving then said plaintiff rolled her eyes and twitched in the seat when she was meeting with Plaintiff and that was the reason she called Muffoletto into the office.

49. Muffoletto then said, "I can tell there is tension so let's discuss what's going on." Irving then said that Plaintiff does not want supervision/feedback and that she only wants to summarize her work. Plaintiff said that is incorrect; she was opened to feedback.

50. Irving then said that she was checking Plaintiff's workers' files and no notes were present. Thus, Irving could not determine whether the children in those cases were safe. Plaintiff again reiterated that she usually has a good work ethic and she just returned from leave, which is why she had limited control over her social workers.

51. Muffoletto said that it is reasonable to not know every detail of every case file. Plaintiff then said Irving's complaints had nothing to do with the immediate supervision session, rather, Irving was still upset with Plaintiff from the difference of opinion both individuals had

over the Gillis Case. Plaintiff noted that Irving did not even speak to her anymore as a result of that case.

52. Irving then said "let's discuss what happened on the night of the removal. You were running around the agency acting anxious." Irving thus disclosed Plaintiff's anxiety to Muffoletto.

53. Plaintiff disputed Irving's statement; Plaintiff found Irving to be unsupportive, and plaintiff thought it was inappropriate how Irving yelled and talked down to her in front of Bailey-Smith.

54. Irving yelled again in an aggressive manner and said, "write it up in the complaint." Irving claimed she told Plaintiff to write it up to understand, from Plaintiff's perspective, why Irving was being aggressive. Irving then claimed that Plaintiff was defaming her character and that she does not yell.

55. Muffoletto asked Irving and Plaintiff what they could do to resolve the dispute. Plaintiff said she needed to be treated with respect. Irving continued to accuse Plaintiff of failure to consult with her about cases, and Irving stated she did not like it when Plaintiff would work with Ellen Walker. Plaintiff then explained that Irving told her to work with Walker because Irving was covering too many people. Muffoletto advised Irving to end the meeting because she had another meeting to go and asked that we continue this discussion later. Irving refused and said to Muffoletto, "we're going to finish supervision." Muffoletto left the room.

56. Plaintiff tried to leave, but Irving said, "sit down." Plaintiff asked Irving why she was behaving like this. Plaintiff further said "I am a good worker. Are you aware I received the Hero award and have gotten recognition from quality assurance for submitting thorough investigations?" Irving replied, "So what, you've gotten complaints and you harasses your

9

workers and you keep them in supervision too long and that's not good practice!" Plaintiff told Irving her statements were untrue and asked who told her these things. Irving abruptly got up from her seat, smiled and said, "I have a meeting to attend, and that's why next time Muffoletto is going to be at your next supervision."

57. On January 17, 2018, at 11:52 a.m., Irving sent an email stating, "Did you attend the Mgt meeting?" She then confronted Plaintiff in person and asked if she attended the meeting. After Plaintiff returned to her office, Plaintiff saw that Irving also called Plaintiff's desk phone to ask if she attended the meeting. Plaintiff was at the meeting and signed in; Plaintiff sat behind Irving. In addition, Irving knew that Plaintiff would be late to the meeting because Plaintiff was facilitating team assignments that morning.

58. On January 18, 2018, Irving sent an email accusing Plaintiff of lying about a case. Her allegation was that Plaintiff did not consult with her.

59. Later that evening, Irving sent another accusatory email, in which she insinuated that Plaintiff was not managing her social workers. She also stated that the only thing Plaintiff was concerned about was case closure and not child safety. This is patently false, as Plaintiff's professional goal is to ensure quality, not quantity.

60. On January 21, 2018, Plaintiff led a meeting with her social workers. After the meeting, Irving questioned Plaintiff's social workers because of an alleged complaint that Plaintiff's meeting felt like a lecture, not a meeting. Irving never discuss the concerns regarding the meeting with Plaintiff. There is no evidence that the alleged complaint about Plaintiff's meeting even exists.

61. In late January 2018, Plaintiff sent Muffoletto an email in response to the accusatory emails Irving sent on January 18, 2018. In her email, Plaintiff refuted all of the false statements

10

Irving made about Plaintiff's conduct. Plaintiff further stated the situation working under Irving had become far too dysfunctional and hostile. Plaintiff asked Muffoletto for her professional recommendation of how to resolve the situation.

62. Muffoletto responded the next day and asked how Irving's statements were false. Muffoletto suggested setting up a meeting between herself, Irving, and Plaintiff. Plaintiff did not respond to Muffoletto's question because she felt it would be easier to go through the specific accusations and rebuttals in-person.

63. Despite Plaintiff's complaints, Muffoletto took no action following Plaintiff's email.

64. Plaintiff was afraid to go above Muffoletto to complain further because Irving and Muffoletto were in powerful positions, and Plaintiff feared retaliation.

65. Plaintiff shared her concerns with her former supervisors. She did not complain to her social workers, but they were generally aware of the ongoing harassment. Plaintiff also shared her concerns with Shawn Winslow, an HR Manager. Plaintiff told Winslow that my Irving was trying to get rid of her. He then introduced Plaintiff to Nina Jones, the HR Director, and Plaintiff told Jones the same thing she told Winslow. Jones stated that she was not available to get involved in Plaintiff's dispute with Irving.

66. Despite the ongoing harassment, on February 14, 2018, Irving complimented Plaintiff and her entire team for good work performance.

67. After making the compliment, Irving continued harassing Plaintiff.

68. Irving then accused Plaintiff of chastising and harassing her social workers, so much so that the social workers no longer wanted to work under Plaintiff. This accusation was patently false, and all of the social workers under Plaintiff refuted Irving's accusation.

69. Irving then accused Plaintiff of calling and harassing her social workers after hours. Irving further alleged that Plaintiff was engaging in these behaviors because her anxiety caused her an irrational desire to close out cases. Plaintiff also categorically denies these accusations.

70. Irving continued to bring up alleged issues with Plaintiff's work. These allegations continued to be false. One was that Plaintiff's team had no case backlog, and that was "out of the ordinary." Thus, Irving was penalizing Plaintiff for performing her job effectively.

71. Irving then accused Plaintiff of unfairly referring cases to the social workers under her supervision. Plaintiff never received a complaint from any of her social workers about unfairness of case assignments. Furthermore, supervisor Katie Grodin told Plaintiff she had no issues with the team assignments while supervising Plaintiff's team while Plaintiff was on leave.

72. Irving also continued to question Plaintiff's social workers. This created division within the team and tension between Plaintiff's team and upper management.

73. Finally, Irving continued to insist that Plaintiff was spending too much time supervising the social workers on her team. Plaintiff denied this assertion and stated that she conducts supervision sessions of an hour or less for each team member per week, with exceptions for complicated cases.

74. At this point, Irving began to take notes of every conversation with plaintiff to create a "paper trail." Plaintiff fears that Irving's notes were inaccurate and taken from Irving's point of view, accounting for all of the false allegations Irving made over the previous months. Plaintiff began taking her own notes to paint a more accurate picture of the situation.

75. On March 2, 2018, Plaintiff had to take off work due to her father's unplanned emergency surgery. Irving insisted on conducting weekly supervision with Plaintiff that day, both calling and texting Plaintiff when she knew Plaintiff was unavailable. Irving also questioned

plaintiff's judgment on working remotely and allowing her social workers to spend the day unsupervised.

76. On March 9, 2018, Plaintiff participated in a focus group with court-appointed monitors. She briefly informed them about her ongoing issue with Irving.

77. On March 12, 2018, Irving accused Plaintiff of avoiding her. Plaintiff noted this was not true; she had been taking time off to care for her father after his surgery, which was going to take a longer time than originally anticipated. Plaintiff intended to apply for leave under FMLA.

78. On March 14, 2018, Irving told Plaintiff that HR wanted to meet with her. Plaintiff met with Nina Jones and Renee Prather-Hairston and was told it was her last day. Plaintiff was placed on Administrative Leave with a termination date of March 29, 2018, and when she asked for an explanation, Jones stated "You are an at-will employee." No further explanation for the termination was provided.

79. At the time Plaintiff was placed on Administrative Leave, there were no disciplinary actions pending against her.

80. Plaintiff's employment with Defendant was terminated effective March 29, 2018. Plaintiff's Termination Letter was signed by: Brenda Donald, Director; Dr. Heather Stowe, Principle; and Jill Forbes, Deputy Director.

81. Plaintiff has been unemployed since her termination.

82. Plaintiff began receiving unemployment insurance payments in June, 2018.

83. As a result of the Defendant's actions, Plaintiff has suffered loss of income, emotional distress, and pecuniary damages.

## IV. STATEMENT OF CLAIMS

### Count I: Disability Discrimination (ADA)

84. Plaintiff adopts and incorporates by reference ¶¶ 1-83 above.

85. Defendant violated Plaintiff's rights to nondiscrimination under the ADA by allowing Irving to continue harassing Plaintiff after multiple notifications.

86. Harassment of Plaintiff was severe and pervasive.

87. As a result of Defendant's violations of the ADA nondiscrimination clause, Plaintiff has suffered and is suffering injuries, including loss of past, present, and future earnings and considerable mental distress.

### Count II: Disability Discrimination (D.C. Human Rights Act)

88. Plaintiff adopts and incorporates by reference ¶¶ 1-87 above.

89. Defendant violated Plaintiff's rights to nondiscrimination under the D.C. Human Rights Act by allowing Irving to continue harassing Plaintiff after multiple notifications.

90. Harassment of Plaintiff was severe and pervasive.

91. As a result of Defendant's violations of the D.C. Human Rights Act nondiscrimination clause, Plaintiff has suffered and is suffering injuries, including loss of past, present, and future earnings and considerable mental distress.

### Count III: Retaliation (ADA & D.C. Human Rights Act)

92. Plaintiff adopts and incorporates by reference ¶¶ 1-91 above.

93. As stated above, Plaintiff began engaging in protected activity in or around December 2017 after experiencing discrimination by Irving, an agent of Defendant.

94. As a result of engaging in protective activity, Defendant placed Plaintiff on administrative leave and then terminated her.

95. As a result of Defendant's violations of the D.C. Human Rights Act retaliation clause,

Plaintiff has suffered and is suffering injuries, including loss of past, present, and future earnings and considerable mental distress.

## IV. **REMEDIES SOUGHT**

96. WHEREFORE, Plaintiff respectfully requests that the Court issue a judgment granting her the following relief from Defendant:

   a. A declaratory judgment that defendant discriminated and retaliated against Plaintiff, as alleged herein;

   b. Back pay, including without limitation other lost benefits due to Defendant's discrimination and retaliation against Plaintiff;

   c. Compensatory and punitive damages, pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. §§ 1981a(a)(2), 1981a(b)(3)(A), for taking these actions with malice and bad faith;

   d. Prejudgment and post judgment interest on all damages, on the lost compensation and compensatory damages;

   e. Reasonable attorneys' fees and costs under 42 U.S.C. §§ 1981a, 2000e-5(k); and

   f. Such other and further relief as to the Court seems just and warranted.

## VI. **JURY TRIAL DEMAND**

97. Plaintiff requests a jury trial on all issues of fact and damages arising herein.

Respectfully submitted,

*Edgar Ndjatou*
_____
EDGAR NDJATOU
McCree Ndjatou, PLLC
1828 L Street, NW, Suite 600
Washington, DC 20036
T: (202) 290-3724
F: (202) 370-7173

15

endjatou@mnlawyerspllc.com
*Attorney for Plaintiff*

16