# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| TONIA INGRAM, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 18-1598 (RC) |
| | : | | |
| v. | : | Re Document No.: | 10 |
| | : | | |
| DISTRICT OF COLUMBIA CHILD AND FAMILY SERVICES AGENCY, | : | | |
| | : | | |
| Defendant. | : | | |

# **MEMORANDUM OPINION**

### GRANTING IN PART AND DENYING DEFENDANT'S MOTION TO DISMISS

## I. INTRODUCTION

Tonia Ingram, a former employee of the District of Columbia Child and Family Services Agency ("CFSA"), brought this lawsuit challenging discriminatory and retaliatory practices by CFSA that she alleges eventually led to her termination. Ingram suffers from severe anxiety, and she alleges that CFSA discriminated against her on the basis of that disability, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–213, and D.C. Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401.01 to -1404.04. Ingram further alleges that CFSA retaliated against her after she complained about the discrimination by terminating her employment, in violation of the ADA and DCHRA. CFSA has now moved to dismiss Ingram's complaint in its entirety, arguing that Ingram has failed to exhaust her administrative remedies as to her ADA retaliation claim, never engaged in a protected activity that would form the basis for a DCHRA retaliation claim, and does not qualify as disabled under the ADA and DCHRA. The Court agrees only as to the first argument. First, Ingram concedes that she has failed to exhaust her administrative remedies as to the ADA retaliation claim, and the Court therefore dismisses it.

However, taking all inferences in her favor—as it must at the motion to dismiss stage—the Court finds that Ingram has sufficiently alleged that she engaged in a protected activity, and it accordingly denies the motion to dismiss Ingram's DCHRA retaliation claim. And because Ingram has alleged facts sufficient to plausibly infer that she was regarded as disabled by CFSA, the Court also denies the motion to dismiss as to her ADA and DCHRA disability discrimination claims.[1]

## II. FACTUAL BACKGROUND[2]

### A. Ingram's Background and Employment at CFSA

Ingram is a licensed clinical social worker with over fifteen years of experience. Compl. ¶¶ 13–14, ECF No. 1. She suffers from severe anxiety, which she was formally diagnosed with in the 2000s. *Id.* ¶ 11. Ingram has been prescribed anxiety medication to help deal with the condition and she "also seeks mental health counseling as needed." *Id.* While Ingram worked at CFSA, she mentioned her condition to some of her coworkers, including to her supervisors, but she never informed the agency's human resources department ("HR") of the condition. *See id.* ¶ 12.

In September 2011, Ingram was hired by CFSA as an investigator social worker. *Id.* ¶ 15. The position required Ingram to "assess[] and investigate[] allegations of neglect and physical and sexual assault of children living in the District of Columbia." *Id.* ¶ 16. Ingram

---

[1] In her opposition, Ingram also appears to be requesting leave to amend her complaint. Because it is unclear to the Court whether this request for leave is in the alternative to Ingram's other arguments, and because Ingram has neither filed a motion for leave to amend nor complied with the meet-and-confer requirements of this Court's local rules, *see* D.D.C. R. 7(m), the Court does not address the request in this opinion. Ingram remains free to file a motion for leave to amend her complaint if she so desires.

[2] On a motion to dismiss for failure to state a claim, the Court accepts as true the factual allegations in the complaint and construes them liberally in the Plaintiff's favor. *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000).

performed well on the job, obtaining a "Hero Award" in 2014 for providing excellent service and receiving an invitation to participate in a CFSA rapid response team tackling backlogged cases in 2015. *See id.* ¶ 17. In 2016, Ingram was promoted to the position of supervisory social worker, in which she would "supervis[e] a team of four Child Protective Social Workers." *Id.* ¶ 19. After her promotion, Ingram's new supervisor became Cherlitheia Irving, a program manager at CFSA. *See id.* ¶¶ 18–19.

Ingram initially had a cordial relationship with Irving. *See id.* ¶ 20. While Irving was formally assigned as Ingram's supervisor, Ingram "did not report to her regularly" and Irving would advise Ingram "to seek consultation with another Program Manager because Irving supervised too many people to advise [Ingram]." *Id.* However, Irving and Ingram began meeting more regularly around November 2017, at which point "the relationship began to sour." *Id.* ¶ 21. Although Irving gave Ingram a satisfactory performance evaluation in December 2017, *id.* ¶ 22, she shortly thereafter began harassing her, *id.* ¶ 23.

On December 11, 2017, Irving expressed doubts about Ingram's judgment regarding a particular case where Ingram had indicated that removal of children from their parents' custody might be necessary (the "Gillis case"). *Id.* ¶¶ 24–25. While discussing the Gillis case, Irving accused Ingram of "failure to listen and failure to accept constructive criticism" in a "harsh and condescending manner." *Id.* ¶ 27. According to Ingram, Irving then continued to harass her specifically because of her anxiety, "us[ing] Ingram's anxiety as a means of controlling the narrative of [Ingram]'s work, conduct, and performance." *Id.* ¶ 32. Irving "made it appear to others in the organization that [Ingram] was no longer able to make sound clinical decisions due to her anxiety," and "mocked [Ingram] by making statements to upper management that she was

'running around acting anxious.'" *Id.* Irving also "falsely accused [Ingram] of harassing and chastising workers because she suffers from anxiety." *Id.* ¶ 33.

On December 13, 2017, Ingram reached out to Elizabeth Muffoletto, a program administrator at CFSA. *See id.* ¶¶ 31, 35. Ingram "recounted the details of the harassment caused by Irving" but "noted that there was no altercation, rather there was a difference in opinion and a discussion with respect to the Gillis Case." *Id.* ¶¶ 36–37. She told Muffoletto that "this was the first time she had a removal case with Irving as supervisor, it was messy, and Irving was unsupportive." *Id.* ¶ 37. And she asked Muffoletto if she could be moved from Irving's supervision to another program manager, because "she perform[ed] better under" the other program manager, who was more supportive. *Id.* ¶ 39. Muffoletto denied the transfer of supervision. *See id.* Muffoletto also told Ingram that she "was acting paranoid and that her thoughts were all over the place," which Ingram explained was because her anxiety "was getting bad and she was having difficulties articulating her thoughts." *Id.* ¶ 38.

On January 12, 2018, Ingram had a supervision meeting with Irving. *See id.* ¶ 43. After the meeting became contentious, Irving called Muffoletto into her office to "observe [Ingram's] behavior." *Id.* ¶ 45. Irving accused Ingram of rejecting her supervision and feedback, *see id.* ¶ 49, and of failing to take appropriate notes in her cases, *id.* ¶ 50. Irving also told Ingram that she was "running around the agency acting anxious" the night of the removal in the Gillis case. *Id.* ¶ 52. Irving continued to criticize Ingram's work over the next few weeks, accusing her of, *inter alia*, "lying about a case" and "not managing her social workers" on January 18, 2018, *id.* ¶¶ 58–59. Ingram again complained to Muffoletto, who "took no action" as a result. *Id.* ¶ 63. At some later point in February, Irving "accused [Ingram] of calling and harassing her social

workers after hours," which "Irving alleged . . . was . . . because [Ingram's] anxiety caused her an irrational desire to close out cases." *Id.* ¶ 69.

The relationship between Irving and Ingram ultimately got so bad that "Irving began to take notes of every conversation with [Ingram] to create a 'paper trail,'" with Ingram herself "taking her own notes to paint a more accurate picture of the situation." *Id.* ¶ 74. On March 9, 2018, Ingram "participated in a focus group with court-appointed monitors" and "briefly informed them about her ongoing issue with Irving." *Id.* ¶ 74. On March 14, Ingram was informed by CFSA HR that she would be terminated, with no explanation for the termination other than the fact that she was an at-will employee. *Id.* ¶ 78. Ingram was placed on administrative leave starting March 15, and was formally terminated on March 29, 2018. *See id.* ¶¶ 78–80.

### B. Procedural History

Ingram filed a formal charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 23, 2018. *See id.* ¶ 2. On April 5, 2018, the EEOC issued Ingram a right to sue letter. *See id.* ¶ 5. Ingram filed suit on July 5, 2018, bringing claims for disability discrimination and retaliation under both the ADA and DCHRA. *See id.* ¶¶ 84–95. CFSA has now moved to dismiss the entire complaint for failure to state a claim. *See* Def.'s Mem. Supp. Mot. Dismiss, ECF No. 10. Ingram has filed an opposition, *see* Pl.'s Mem. Opp'n Mot. Dismiss, ECF No. 12, and CFSA has filed its reply, *see* Def.'s Reply, ECF No. 13. The motion is now ripe for consideration.

### III. LEGAL STANDARD

To prevail on a motion to dismiss for failure to state a claim, a plaintiff need only provide a "short and plain statement of [her] claim showing that [she is] entitled to relief," Fed. R. Civ. P.

8(a)(2), that "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (second alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a complaint" under that standard; it asks whether the plaintiff has properly stated a claim. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In considering such a motion, the complaint must be construed "liberally in the plaintiff's favor with the benefit of all reasonable inferences derived from the facts alleged." *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006) (citing *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). This means that a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555–56 (citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are therefore insufficient to withstand a motion to dismiss. *Iqbal*, 556 U.S. at 678. A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of the legal conclusions that are couched as factual allegations. *See Twombly*, 550 U.S. at 555.

## IV. ANALYSIS

CFSA has moved to dismiss Ingram's entire complaint for failure to state a claim. The agency argues that Ingram's ADA retaliation claim fails because Ingram has not exhausted her administrative remedies, *see* Def.'s Mem. Supp. 6–9, that her DCHRA retaliation claim fails

because she has not alleged that she took part in a protected activity, *see id.* at 9–11, and that her disability discrimination claims under the ADA and DCHRA fail because she has not alleged that she is disabled under those Acts, *see id.* at 4–6. As an initial matter, the Court grants the motion to dismiss Ingram's ADA retaliation claim because she concedes that she has failed to exhaust her administrative remedies. *See* Pl.'s Mem. Opp'n 2. The Court reviews CFSA's two other arguments in turn. Finding neither persuasive, it denies the motion to dismiss as to both Ingram's DCHRA retaliation claim and her two disability discrimination claims.

### A. Ingram Has Sufficiently Alleged that She Engaged in Protected Activity

First, the Court addresses CFSA's argument that Ingram fails to state a retaliation claim under the DCHRA because she "has not alleged a protected activity within the meaning of the DCHRA." Def.'s Mem. Supp. 9. While recognizing that Ingram complained about harassment by Irving on several occasions, CFSA contends that she did not engage in protected activity because she "fails to plausibly assert that her complaints to management mentioned alleged discriminatory conduct by Irving." *Id.* at 10. That argument certainly has merit, and the issue is a close call. But, taking all inferences in Ingram's favor at the motion to dismiss stage, the Court finds that her allegations are sufficient—though barely—to suggest that she complained about discrimination. The Court therefore denies CFSA's motion to dismiss the DCHRA retaliation claim.

DCHRA retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework, pursuant to which a plaintiff must first establish a *prima facie* case of retaliation. *See, e.g.*, *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010); *Carpenter v. Fed. Nat'l Mortgage Ass'n*, 174 F.3d 235 n.3 (D.C. Cir. 1999). And "[t]he elements of a retaliatory claim are the same under the DCHRA as under the federal employment discrimination laws." *Leftwich*

*v. Gallaudet Univ.*, 878 F. Supp. 2d 81, 97 (D.D.C. 2012) (citing *Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C. 1994)). To make a *prima facie* case of retaliation under the DCHRA, a plaintiff must therefore allege "(1) that she engaged in protected activity; (2) that she was subjected to adverse action by the employer; and (3) that there existed a causal link between the adverse action and the protected activity." *Walden v. Patient-Centered Outcomes Research Inst.*, 177 F. Supp. 3d 336, 343 (D.D.C. 2016) (quoting *Powell v. Am. Red Cross*, 518 F. Supp. 2d 24, 36 (D.D.C. 2007)).

Protected activity "encompasses utilizing informal grievance procedures such as complaining to management or human resources about the discriminatory conduct." *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 200 (D.D.C. 2012) (citing *Richardson v. Gutierrez*, 477 F. Supp. 2d 22, 27 (D.D.C. 2007)). However, "[n]ot every complaint garners its author protection." *Id.* at 205 (alteration in original) (quoting *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006)). "While no 'magic words' are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition." *Broderick,* 437 F.3d at 1232.

Here, CFSA argues that Ingram cannot establish her *prima facie* case of retaliation because she did not engage in any protected activity. Def.'s Mem. Supp. 9–10. Although Ingram complained to Muffoletto about Irving's conduct on repeated occasions, CFSA contends that the complaint does not make any allegations that Ingram complained of discriminatory conduct specifically. *See id.* at 10. In her opposition, Ingram retorts that the December 13, 2017 meeting with Muffoletto was a protected activity because she complained about harassment by Irving on the basis of Ingram's anxiety. Pl.'s Opp'n 4. Although it is a very close call, the Court sides with Ingram.

8

To be sure, the complaint is very light on the details of just how much Ingram told Muffoletto at the December 13, 2017 meeting.  Some of Ingram's allegations point to a personal dispute unconnected to discrimination, with Ingram allegedly telling Muffoletto that her problem with Irving came from "a difference of opinion . . . about the Gillis Case," Compl. ¶ 37, that Irving was "unsupportive," *id.*, and that Ingram wanted to be removed from Irving's supervision because "she perform[ed] better" under another supervisor, who was more supportive, *id.* ¶ 39. But Ingram does allege that she believed at the time that "Ingram's harassment was directed at her because of her anxiety," *id.* ¶ 32, and that she "cried as she recounted the details of the harassment caused by Irving" at the meeting with Muffoletto, *id.* ¶ 36.  Taking all inferences in Ingram's favor, it could be inferred that Ingram's recounting of the details of harassment she believed was caused by her anxiety would have involved disclosing this perceived discrimination to Muffoletto. Although there are few relevant allegations for the Court to rely on, it construes the complaint liberally and finds that Ingram has sufficiently alleged that the December 13, 2017 meeting was a protected activity at this early stage.  Because CFSA does not make any other argument for dismissal, the Court denies the motion to dismiss as to the DCHRA retaliation claim.

### B. Ingram Has Sufficiently Alleged that She is Disabled

Next, the Court turns to Ingram's disability discrimination claims pursuant to the ADA and DCHRA.  CFSA argues that the claims fail as a matter of law because Ingram has not sufficiently alleged that she is disabled within the meaning of the two statutes.  *See* Def.'s Mem. Supp. 4–6.  And, in a footnote, CFSA also appears to contend that Ingram's claims should be dismissed because she has not alleged that she requested a reasonable accommodation for her anxiety.  *See id.* at 6 n.4.  The Court finds neither argument persuasive—indeed, CFSA appears

to misstate the law regarding what constitutes a disability discrimination claim. It accordingly denies the motion to dismiss Ingram's disability discrimination claims.[3]

As with Ingram's DCHRA retaliation claim, both her ADA and DCHRA disability discrimination claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *See, e.g.*, *Giles v. Transit Emps. Fed. Credit Union*, 794 F.3d 1, 5 (D.C. Cir. 2015). To establish a *prima facie* case of discrimination under both the ADA and DCHRA, a plaintiff must show "that she was disabled within the meaning of the ADA, she was qualified for the position at issue with or without a reasonable accommodation, and she suffered an adverse employment action because of her disability." *Walden*, 177 F. Supp. 3d at 341 (citing *Giles*, 794 F.3d at 5).

"'Disability' is a[] term of art . . . that carries a specific meaning." *Adams v. Rice*, 531 F.3d 936, 943 (D.C. Cir. 2008). In order to qualify as disabled under the ADA, an individual must have "(A) a physical or mental impairment that substantially limits one or more major life activities of such an individual; (B) a record of such an impairment;" or (C) must be "regarded as having such an impairment." 42 U.S.C. § 12102(1). Importantly, "[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that . . . she has been subjected to [discrimination] because of an actual or perceived physical or

---

[3] The Court notes that the complaint leaves unclear whether Ingram truly intended to bring a disability discrimination claim or whether she intended to bring a claim for hostile work environment. The complaint repeatedly references Irving's "harassment" of Ingram, *e.g.* Compl. ¶ 32 ("Irving's harassment was directed at [Ingram] because of her anxiety."); *id.* ¶ 85 ("Defendant violated Plaintiff's rights to nondiscrimination under the ADA by allowing Irving to continue harassing Plaintiff after multiple notifications."). And, in stating her claims for disability discrimination, Ingram alleges that the harassment was "severe and pervasive," *id.* ¶¶ 86, 90, an element of a hostile work environment claim, *see, e.g.*, *Floyd v. Lee*, 968 F. Supp. 2d 308, 334 (D.D.C. 2013) (noting that, to prevail on hostile work environment claim, the plaintiff had to establish that alleged harassment was "sufficiently severe or pervasive to alter the conditions of her employment" (quoting *Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 24 (D.C. Cir. 2013))).

mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Id.* § 12102(3)(A); *see also Alexander v. Wash. Metro. Transit Auth.*, 826 F.3d 544, 548 (D.C. Cir. 2016) (noting that a "regarded-as claim 'does not require a showing of an impairment that substantially limits a major life activity'" (quoting 29 C.F.R. § 1630.2(g)(3)). And Congress has made clear that "[t]he definition of disability . . . shall be construed in favor of broad coverage under th[e] [ADA]." 42 U.S.C. § 12102(4)(A).

CFSA argues that an individual is disabled under the ADA when she has "a physical or mental impairment that substantially limits one or more major life activities," Def.'s Mem. Supp. 5 (quoting 42 U.S.C. § 12102(1)), and that Ingram has not alleged she is disabled under the ADA because she "does not allege that her 'severe anxiety' substantially limits a major life activity," *id.* The obvious problem with CFSA's argument is that it misstates the standard for what constitutes a disability by disregarding the two other ways in which an individual can qualify as disabled. And here, the Court agrees with Ingram that she has met that standard, at least at the motion to dismiss stage, because there are sufficient allegations to create the inference that CFSA regarded Ingram as disabled. Ingram alleges that Irving harassed her because of her anxiety. *See* Compl. ¶ 32. She accuses Irving of using her anxiety "as a means of controlling the narrative of [her] work, conduct and performance[,] . . . ma[king] it appear to others in the organization that [Ingram] was no longer able to make sound clinical decisions due to her anxiety," and "mock[ing] [Ingram] by making statements to upper management that she was 'running around acting anxious.'" *Id.* She also alleges that Irving "accused [her] of calling and harassing her social workers after hours . . . because her anxiety caused her an irrational desire to close out cases." *Id.* ¶ 69. And she alleges that Muffoletto told her she "was acting paranoid and . . . her thoughts were all over the place" when she discussed her concerns about Irving. *Id.* ¶ 38.

Construing the complaint liberally, these allegations create the plausible inference that CFSA regarded Ingram's anxiety as a mental impairment, satisfying the "regarded as" definition of disability, *see* 42 U.S.C. § 12102(1)(C).

In a footnote, CFSA also argues that Ingram "failed to allege any facts showing that at any point she requested or required any reasonable accommodations." Def.'s Mem. Supp. 6 n.5. In doing so, CFSA appears to confuse the *prima facie* case for failure to accommodate with the *prima facie* case for disability discrimination. As discussed above, establishing a *prima facie* case of disability discrimination under the ADA or DCHRA does not require a plaintiff to request a reasonable accommodation. Instead, all a plaintiff must show is "that she was disabled within the meaning of the ADA, she was qualified for the position at issue with or without a reasonable accommodation, and she suffered an adverse employment action because of her disability." *Walden*, 177 F. Supp. 3d at 341. Such an adverse employment action can take many forms, including "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Id.* at 342 (quoting *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009)). Whether Ingram made a request for a reasonable accommodation is therefore not relevant to her disability discrimination claims.[4] And because CFSA does not make any

---

[4] The Court once again notes that it is unclear whether Ingram intended to bring a claim for failure to accommodate in her complaint. On one hand, Ingram formally brings claims only for disability discrimination and retaliation. *See* Compl. ¶¶ 84–95. On the other hand, she alleges that she "asked if Muffoletto could accommodate her" at the December 13, 2017 meeting, *id.* ¶ 39, which suggests she may have intended to make such a claim. To the extent Ingram still intends to file a motion for leave to amend, clarifying exactly what claims she brings would be helpful both to the Court and to the parties in efficiently resolving this case.

other argument for dismissal, the Court denies the motion to dismiss the ADA and DCHRA discrimination claims.[5]

## V.  CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss (ECF No. 10) is **GRANTED IN PART AND DENIED IN PART**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  August 21, 2019                                       RUDOLPH CONTRERAS
                                                                                  United States District Judge

---

[5] The complaint does not explicitly allege what adverse action suffered by Ingram forms the basis for her disability discrimination claims.  But CFSA fails to otherwise make any argument as to adverse action, and it is not the Court's role "to act as an advocate for [the parties] and construct legal arguments on [their] behalf." *Beach TV Props., Inc. v. Solomon*, 383 F. Supp. 3d 25, 33 (D.D.C. 2019) (alterations in original) (quoting *United States v. Real Prop. Identified as: Parcel 03179-005R*, 287 F. Supp. 2d 45, 61 (D.D.C. 2003)).  Regardless, Ingram's termination easily qualifies as an adverse action.  *See, e.g.*, *Nat'l R.R. Corp. v. Morgan*, 536 U.S. 101, 114 (2002).