## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| TONIA INGRAM, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 18-1598 (RC) |
| | : | | |
| v. | : | Re Document No.: | 40 |
| | : | | |
| DISTRICT OF COLUMBIA, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

Plaintiff Tonia Ingram, a former employee of the District of Columbia Child and Family Services Agency, brings this employment discrimination action against the District of Columbia ("the District") alleging both disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, and the D.C. Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401.01 to 1404.04, as well as a retaliatory discharge under the DCHRA.  The District has moved for summary judgment, arguing that Ms. Ingram cannot establish a prima facie case under either claim, and that even without this deficiency, that Ms. Ingram was terminated for a legitimate, non-discriminatory reason that she fails to show was pretextual.  For the reasons discussed below, the Court will grant the District's motion for summary judgment.

## II.  PRELIMINARY MATTERS

As a preliminary matter, the Court will first discuss Ms. Ingram's failure to comply with the requirements of Local Civil Rule 7(h)(1) in regard to her statement of genuine issues filed along with her opposition brief.  This District has supplemented Rule 56 of the Federal Rules of Civil Procedure with Local Civil Rule 7(h), pursuant to which a party filing a motion for

summary judgment must include a statement of material facts as to which that party contends there is no genuine dispute.  *See Herbert v. Architect of Capitol*, 766 F. Supp. 2d 59, 63–64 (D.D.C. 2011).  "The party opposing the motion must, in turn, submit a statement enumerating all material facts which the party contends are genuinely disputed."  *Id.* at 63 (citing LCvR 7(h)(1)).  This statement of disputed facts "shall include references to the parts of the record relied on to support the statement."  LCvR 7(h)(1); *Footbridge Ltd. Tr. v. Zhang*, 584 F. Supp. 2d 150, 154 (D.D.C. 2008), *aff'd*, 358 F. App'x 189 (D.C. Cir. 2009) (noting violation of Rule 7(h) by party who submitted "several facts that lack *any* citation to record evidence" despite this "clear requirement" of the Local Rules) (emphasis in original).  This requirement places the burden of summarizing the record with the parties, as they are most familiar with the particulars of the case.  *See Potter v. District of Columbia,* 558 F.3d 542, 550 (D.C. Cir. 2009) ("[E]vidence laying dormant in the record is not enough, for the district court is not obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make [its] own analysis and determination of what may, or may not, be a genuine issue of material disputed fact.").

When the party opposing summary judgment fails to comply with this obligation, by either failing to submit a statement of disputed facts or submitting a deficient statement, "a court may take all facts alleged by the movant as admitted."  *Essroc Cement Corp. v. CTI/D.C., Inc.*, 740 F. Supp. 2d 131, 139 (D.D.C. 2010); *see also Arrington v. United States*, 473 F.3d 329, 335 (D.C. Cir. 2006) (holding that non-compliance with Local Civil Rule 7(h) permits the district court to assume the facts identified by the moving party as admitted, though the court retains the discretion to review the entire record); *United States v. Mohammad*, 15-cv-514, 249 F. Supp. 3d 450, 456–57, 2017 WL 1403144, at *4 (D.D.C. Apr. 19, 2017) ("[C]ourts may accept as true any

factual assertions submitted by the movant in support of its motion, unless the non-movant submits his or her own evidence showing the movant's assertions are untrue.").

Ms. Ingram has failed to comply with the requirements of Local Rule 7(h).  She did not respond or attempt to rebut any of the nineteen undisputed material facts submitted by the District, *see* Def.'s Statement of Undisputed Material Facts ("Def.'s SUMF"), ECF No. 40, instead providing four of her own "facts" she contends are in dispute.  *See* Pl.'s Statement of Mat. Facts in Dispute ("Pl.'s SMF"), ECF No. 41.  But Ms. Ingram's purported "material facts in dispute" are in actuality unsupported factual assertions that veer into the territory of legal conclusions, the entirety of which are provided without any of the required record citations.  *See, e.g.*, Pl.'s SMF ("Throughout the course of her employment at CFSA, Plaintiff was subjected to a pattern of harassment, including, but not limited to, hostile comments directed at her mental health history.").  The District argues that as a result, the Court "should treat the District's statements as undisputed," thus "leading to the inescapable conclusion that the District's termination of Plaintiff from her position with CFSA was due to her job performance and not impermissible discrimination based on her disability."  Def.'s Reply in Further Supp. of Def.'s Mot. for Summ. J. ("Def.'s Reply") at 2–3, ECF No. 42.  Accordingly, the District requests that the Court grant its motion for summary judgment on this basis alone.

The Court is not, however, convinced that this issue should be disposed of in such a cursory fashion.  Certainly, "[r]equiring strict compliance with th[is] local rule is justified both by the nature of summary judgment and by the rule's purposes."  *Wilkins v. Dist. of Columbia*, No. 17-cv-884, 2019 WL 3767164, at *2 (D.D.C. Aug. 9, 2019) (discussing how "when the statement['s]. . . references to the record are lacking . . . [t]he casualty is the Court's ability to maintain docket control and to decide motions for summary judgment efficiently and

effectively") (citation omitted).  This requirement exists, of course, because to survive a motion

for summary judgment, a party's claims must rely on evidence and not bare allegations, *see*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), which is all Ms. Ingram has provided in her

statement.  Indeed, Ms. Ingram's Statement of Material Facts in Dispute "fail[s] . . . to controvert

most of the facts set forth by defendant" and instead "merely repeats the complaint's allegations

and conclusions."  *Carter v. Greenspan*, 304 F. Supp. 2d 13, 21 (D.D.C. 2004).  Accordingly, the

court would be within its discretion to "assume that [Ms. Ingram] admits those facts presented by

defendant in [its] statement of material facts. . . which [s]he does not refute."  *Id.*; *Jackson v.*

*Finnegan*, 101 F.3d 145, 154 (D.C. Cir. 1996) ("[P]ursuant to the remedy afforded by Rule

[7(h)], the district court is to deem as admitted the moving party's facts that are uncontroverted

by the nonmoving party's Rule [7(h) ] statement."); *Burt v. Nat'l Republican Club of Capitol*

*Hill*, 828 F. Supp. 2d 115, 118–19 (D.D.C. 2011) (same).

Nevertheless, the Court does not wish to penalize Ms. Ingram for an error committed by

her counsel.  As a result, despite Ms. Ingram's failure to appropriately identify the evidence at

issue in her Statement of Disputed Facts, the Court has undertaken its own independent review of

the record, as is its prerogative.  *See Arrington*, 473 F.3d at 335 ("Rule 7(h) permits, but does not

require . . . the district court to enter judgment because of the nonmoving party's default in

complying with the local rule.") (internal quotations and citation omitted).  The Court will

accordingly disregard any of the proffered facts in Ms. Ingram's Statement of Disputed Facts

that based on its own assessment are not properly supported by the record.

## III.  BACKGROUND

Ms. Ingram is a licensed clinical social worker with over fifteen years of experience.  *See*

Pl.'s Resp. to Def.'s First Int. at 3–6, ECF No. 41-3.  After working for the Child Protective

Services Administration ("CPS") of the District of Columbia Child and Family Services Agency ("CFSA") for several years as an investigator social worker, Ms. Ingram was promoted to the role of supervisory social worker on September 18, 2016.  Def.'s SUMF ¶ 1.  In this position, Ms. Ingram managed four social workers within CFSA, who were responsible for investigating reports of child abuse and neglect.  *See* Dep. Tr. of Tonia Ingram ("Ingram Dep. Tr.") at 29:19-30:17, ECF No. 40-6.  During her tenure in this role, Ms. Ingram reported to CPS Program Manager Cheryl Irving who, in turn, reported to CPS Program Administrator Elizabeth Muffoletto.  Def.'s SUMF ¶¶ 2–3.

Around the time of Ms. Ingram's promotion in 2016, she spoke to her new supervisor, Ms. Irving, about her anxiety.  She represents that she told her, "you know, I get anxious.  I get anxious at times.  Sometimes it impacts my speech, you know, it may speed up rapidly sometimes.  Nervous.  Even though I know my job.  I'm good at what I do.  But I still live with this.  I still deal with it."  Ingram Dep. Tr. at 184:10-16.  She did not, however, disclose to any of her CFSA supervisors that she had a formal medical diagnosis of generalized anxiety disorder, *id.* at 194:14-17, that she was in treatment or on medication for this condition, *id.* at 196:1, 196:12-13, or that she required assistance to perform her job in light of this disability, *id.* at 197:15.  That said, at least one of Ms. Ingram's former co-workers, Robert Mays, represents that he is aware of Ms. Ingram's "long standing mental health diagnosis," although the circumstances of how or when he came into this knowledge have not been made clear.  *See* Affidavit of Robert Mays ("Mays Aff.") ¶¶ 3–4, ECF No. 41-1.

It would appear that Ms. Ingram's tenure as a manager at CFSA got off to a strong start following her promotion in late 2016.  During the fiscal year 2017 performance rating period, Ms. Irving rated Ms. Ingram on her performance review as a 3.45/5 or "valued performer,"

which is an average rating for a CPS manager in this role.  Def.'s SUMF ¶ 5.  It bears noting that during this performance period, Ms. Ingram's timely investigation and case closure rates were well above average when compared to other CPS managers in her same position.  *Id.* ¶ 6. However, Ms. Irving now represents that she had concerns about Ms. Ingram's management skills from the beginning of her time as a supervisor.  *Id*. ¶ 4.  These concerns stemmed from complaints made by CFSA constituents regarding Ms. Ingram's professionalism, as well as feedback from Ms. Ingram's supervisees regarding her management skills.  *Id.*; *see also* FY 2017 Ingram Performance Evaluation at 2 ("Earlier during this evaluation period, there were complaints received from both internal and external partners regarding inappropriate customer service."), ECF No. 40-4.

In the months immediately following the 2017 rating period, Ms. Ingram's case closure rate continued to climb until it eventually reached 100%, an unrealistic statistic that drew the suspicion of Ms. Irving.  Def.'s SUMF ¶¶ 7–8.  To investigate her concerns, Ms. Irving began conducting periodic, random audits of Ms. Ingram's caseload, which revealed that Ms. Ingram was continually violating agency protocol for completing abuse and neglect investigations and closing out her cases prematurely in order to meet procedural deadlines.  *Id.* ¶¶ 8–9.  Ms. Irving reported this to Ms. Muffoletto, and was then instructed to discuss these issues with Ms. Ingram and begin putting her feedback to Ms. Ingram in writing.  *Id.* ¶ 10.

Things came to a head in November 2017, when Ms. Muffoletto, filling in for Ms. Irving while she was out on leave, authorized Ms. Ingram to close the investigation of a high-priority child sex abuse case, based on Ms. Ingram's representation that she had followed Ms. Irving's express instructions for the investigation.  *Id.* ¶ 11; Decl. of Elizabeth Muffoletto ("Muffoletto Decl.") ¶¶ 12–16, ECF No. 40-3.  However, Ms. Muffoletto later learned that Ms. Ingram had

misled her about the status of the case and the steps she had completed, resulting in the case's premature closure and potential endangerment of the child at the center of the investigation. *Id.* Ms. Muffoletto reprimanded Ms. Ingram for this misrepresentation, and reopened the case so Ms. Ingram could complete a thorough investigation. Def.'s SUMF ¶ 12. She also had Ms. Irving increase the frequency of Ms. Ingram's supervision meetings at case audits. *Id.* ¶ 13. For the next three months, Ms. Irving did so and continued to counsel Ms. Ingram about the need for her adherence to CFSA protocol for thorough investigations and appropriate case closures, but this advice went unheeded. *Id.* ¶ 14–16. Additionally, in January 2018, Ms. Ingram's supervisees provided Ms. Irving with written feedback indicating that Ms. Ingram was not effectively managing her team. *Id.* ¶ 15; *see also* Attach. Two to Irving Decl. ("Complaint Letters") (detailing extensive mismanagement by Ms. Ingram including inconsistent directions, late-night calls, improper communication with constituents, and bullying tactics), ECF No. 40-2. As a result of this feedback and Ms. Ingram's continued failure to properly investigate and close cases, Ms. Muffoletto accepted Ms. Irving's recommendation to fire Ms. Ingram, effective March 29, 2018. *Id.* ¶ 16.

Ms. Ingram testified during her deposition that throughout her time in the CPS manager role, Ms. Irving treated her in a "hostile or abusive" manner. Ingram Dep. Tr. at 161:22; *see also* Pl.'s SMF ("[Ms. Ingram] was subjected to a pattern of harassment including, but not limited to, hostile comments directed at her mental health history.") (provided without supporting citations). Ms. Ingram attempted to discuss Ms. Irving's behavior with Ms. Muffaletto. *See* Pl.'s SMF ¶ 3 (noting, again without supporting citations, that on December 21, 2017 Ms. Ingram "disclosed her allegations of harassment [by Ms. Irving] to another supervisor, Ms. Muffaletto."). However, while Ms. Ingram told Ms. Muffaletto that Ms. Irving was "not supportive . . . [she

was] aggressive . . . She wasn't nice.  She wasn't kind.  She spoke down on me[,]" she also admitted that in her discussions with Ms. Muffoletto she "didn't use the word discrimination. What I mentioned to her was . . . that I need to be removed [from Ms. Irving's supervision].  I just can't function.  It's just not good for me." Ingram Dep. Tr. at 227:9-22.  Ms. Muffoletto represents that while she met with Ms. Ingram to discuss her working relationship with Ms. Irving, Ms. Ingram never described Ms. Irving's behavior toward her as discriminatory.  Def.'s SUMF ¶¶ 17–18.

Ms. Ingram also testified that she went to CFSA Human Resources roughly a month before she was terminated to speak with the new director, Nina Page, about her concerns regarding Ms. Irving's behavior.  Ingram Dep. Tr. at 191:7-9.  But Ms. Page was unavailable, so Ms. Ingram spoke with Shawn Winslow, telling him that she thought Ms. Irving was trying to have her terminated. *Id.* at 192:11-21.  He conveyed this message to Ms. Page, *id.*, but Ms. Ingram never met with her before her employment with CFSA was ended.

## A.  Procedural History

Ms. Ingram filed suit on July 5, 2018, alleging she was terminated from her position with the CFSA because of her anxiety and/or in an act of retaliation because she reported Ms. Irving's discriminatory animus to Ms. Muffoletto in December of 2017 and later attempted to make a similar disclosure to Human Resources.  *See generally* Compl, ECF No. 1.  Her amended complaint states three claims; disability discrimination under the ADA (Count I), disability discrimination under the DCHRA (Count II), and retaliatory termination under both statutes.  *See* Am. Compl. ¶¶ 84–95, ECF No. 8-1.  The District moved to dismiss Ms. Ingram's complaint for failure to state a claim, *see* Def.'s Mot. to Dismiss, ECF No. 10, which this Court granted in part and denied in part, dismissing Ms. Ingram's retaliation claim brought under the ADA for failure

to timely exhaust administrative remedies, *see Ingram v. D.C. Child & Fam. Servs. Agency*, 394 F. Supp. 3d 119, 124 (D.D.C. 2019).  Following discovery, the District has now moved for summary judgment on all of Ms. Ingram's remaining claims.  *See* Def.'s Mem. of P. & A. Supp. of Def.'s Mot. Summ. J. ("Def.'s Mot."), ECF No. 40.  Ms. Ingram has filed an opposition, *see* Pl.'s Mem. in Supp. of Pl.'s Opp'n to Def.'s Mot. Summ. J. ("Pl.'s Opp'n"), ECF No. 41, and the District has filed its reply, *see* Def.'s Reply.  The motion is now ripe for consideration.

## IV.  LEGAL STANDARD

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial.  *See Celotex Corp.*, 477 U.S. at 323–24.  Accordingly, summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact.  *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323.  A "material" fact is one capable of affecting the substantive outcome of the litigation, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), while a dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant, *see Scott v. Harris*, 550 U.S. 372, 380 (2007).  If the moving party meets this burden, then the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial.  *See Celotex*, 477 U.S. at 324.  The nonmovant must provide evidence that would permit a reasonable jury to find in his or her favor.  *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

When evaluating whether a genuine dispute of fact exists, a court must refrain from making credibility determinations or weighing the evidence; rather, "[t]he evidence of the non-

movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,*
477 U.S. at 255; *see also Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007).  However, a
conclusory assertion offered without any evidentiary support does not establish a genuine issue
for trial.  *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  And because the
nonmovant's evidence must allow a reasonable jury to find in its favor, "merely colorable" or
"not significantly probative" evidence will not preclude summary judgment.  *Potter*, 558 F.3d at
549 (quoting *Anderson*, 477 U.S. at 249–50).

## V.  ANALYSIS

Ms. Ingram's case hinges on her claim that her termination was discrimination on
account of her anxiety disorder, or that it was a retaliatory action made in response to her
attempts to report Ms. Irving's discriminatory behavior.  *See* Am. Compl. ¶¶ 84–95.  In response,
the District contends that it has asserted legitimate, non-discriminatory reasons for Ms. Ingram's
termination from her position as a CFSA supervisory social worker, and argues that because Ms.
Ingram cannot show that the District's asserted rationale for ending her employment was pretext
for illegal discrimination or retaliation, summary judgment is proper.  Def.'s Mot. at 14–16.  For
the reasons listed below, the Court will grant summary judgment in favor of the District.

### A.  Legal Standard Governing Ms. Ingram's ADA and DCHRA Claims

The ADA proscribes any actions that "discriminate against a qualified individual on the
basis of disability in regard to" the "discharge of employees" or the "privileges of employment."
42 U.S.C. § 12112(a).  The DCHRA similarly forbids any covered employer from discharging an
employee "wholly or partially for a discriminatory reason based upon . . . disability."  D.C.
Code § 2–1402.11(a).  Both statutes also prohibit employers from terminating employees in
retaliation for engaging in protected activity under either statute.  *See* 42 U.S.C. § 12203(a); D.C.

Code § 2–1402.61.  In light of these similarities, the D.C. Court of Appeals has directed courts to seek guidance from decisions construing the ADA when interpreting the DCHRA.  *See Hunt v. District of Columbia*, 66 A.3d 987, 990 (D.C. 2013) ("Our decisions under the DCHRA regarding whether an employee was discriminated against because of a 'disability' effectively incorporate judicial construction of related anti-discrimination provisions of the [ADA].").

Consequently, both Ms. Ingram's ADA and DCHRA claims are conveniently analyzed under the same three-step *McDonnell Douglas* burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See, e.g.*, *Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005) (applying *McDonnell Douglas* framework to ADA claims); *E.M. v. Shady Grove Reprod. Sci. Ctr. P.C.*, 496 F. Supp. 3d 338, 373 (D.D.C. 2020) (applying *McDonnell Douglas* framework to DCHRA claims of discrimination and retaliation).  Under the traditional application of this framework, a plaintiff must first establish a prima facie case of retaliation or discrimination, after which the burden of production then shifts to the employer to produce a legitimate, nondiscriminatory reason for its employment action.  *McDonnell Douglas*, 411 U.S. at 802–04.  When an employer has done so, the burden shifts back again to the plaintiff to demonstrate that the offered non-discriminatory or non-retaliatory reason was in actuality a pretext for a prohibited discriminatory or retaliatory act.  *Id.*; *see also Johnson v. Interstate Mgmt. Co.*, 849 F.3d 1093, 1099 (D.C. Cir. 2017).

The D.C. Circuit, however, has recognized that when an employer moves for summary judgment in employment discrimination suits such as this one, "the employer ordinarily will have asserted a legitimate, non-discriminatory reason for the challenged decision."  *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008).  When this is the case, "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie

case under *McDonnell Douglas*." *Id.* (emphasis in original).  Rather, "the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on [a prohibited basis]"? *Id.* This analysis as set out by *Brady* "appl[ies] equally to retaliation claims." *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009).

As a result, the Court (in theory) would need not waste time delving into the "largely unnecessary sideshow" of whether Ms. Ingram has established the various prima facie case elements of her claims.  *Id.* at 494.  Rather, because the "court has before it all the evidence it needs to decide whether the defendant intentionally discriminated against the plaintiff[]," *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983), courts are to proceed directly to the "central question" of if the employer's proffered legitimate, non-discriminatory reason for the adverse employment action is pretextual.  *Brady*, 520 F.3d at 494.  An employee can produce such evidence "either directly by showing that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jones*, 557 F.3d at 678 (brackets and internal quotation marks omitted) (quoting *Aikens*, 460 U.S. at 716).  But a plaintiff must do more than "simply criticiz[e] the [defendant]'s decisionmaking process." *Hairston v. Vance-Cooks*, 773 F.3d 266, 272 (D.C. Cir. 2014).  "The plaintiff must identify evidence from which a reasonable jury could find that the [defendant]'s stated reasons were 'phony.'" *Moeller v. LaFleur*, 246 F. Supp. 3d 130, 140 (D.D.C. 2017) (quoting *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996).  This can be shown through, *inter alia*, an employer's "inconsistent or dishonest explanations, its deviation from established procedures or criteria . . . or other relevant evidence that a jury could reasonably

conclude evinces an illicit motive." *Geter v. U.S. Gov't Publ'g Off.*, 436 F. Supp. 3d 227, 237 (D.D.C. 2020) (citing *Walker*, 798 F.3d at 1092).  However, because Ms. Ingram relies *solely* on prima facie evidence in her arguments against summary judgment, the Court's analysis of the "central question" must necessarily take this evidence into account.

### B.  The District is Entitled to Summary Judgment

In this case, Ms. Ingram does not dispute that the CFSA has asserted a legitimate, non-discriminatory reason for her termination—namely that Ms. Ingram was both "neglecting . . . to follow CFSA protocol and [her supervisor's] repeated directives for safely and appropriately closing child abuse and neglect cases," and that "independent, written feedback from her supervisees further revealed that she was failing to suitably manage their work."  Def.'s Mot. at 15.  Ms. Ingram argues in response that sworn statements submitted by both herself and a colleague, along with her deposition testimony, are sufficient to show that this explanation is simply pretext for discrimination or retaliation.  Pl.'s Opp'n at 4.  The Court is unconvinced, for the reasons it details below.

The Court's analysis focuses on the "central inquiry"— namely, can Ms. Ingram show that a reasonable jury could find that the District's asserted non-discriminatory reasons for her termination were not the actual reasons, and that the District intentionally discriminated or retaliated against her on a prohibited basis?  *See Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2009).  At this stage of analysis, "consideration of this question requires [the court] to evaluate all of the evidence before [it], including the same evidence that a plaintiff would use to establish her prima facie case,"  *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005) (citing *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1151 (D.C. Cir. 2004).

First, a review of the District's proffered non-discriminatory reason for Ms. Ingram's termination is in order.  The District asserts that Ms. Ingram was fired due to her failure to adhere to agency policy and as a result of her subpar performance as a manager.  To support this claim, it has provided testimony from both of her managers that she "refused to adhere to established agency policy . . . at the risk of child safety," Def.'s SUMF  ¶¶ 9, 12, 14, 16, as well as written reports from her supervisees detailing her failures as a manager, *id.* ¶ 15.  An employee's refusal to follow her supervisor's directives and failure to perform designated duties are accepted as legitimate, nondiscriminatory reasons for an adverse employment action.  *See Smith*, 430 F.3d at 455.  Consequently, because the District has asserted a legitimate, non-discriminatory reason for ending Ms. Ingram's employment, the burden shifts to Ms. Ingram to show that a reasonable juror could conclude that this explanation is mere pretext.

Ms. Ingram attempts to meet her burden by arguing generally that "a reasonable jury could find . . . pretext," because a review of all of her evidence shows that the District's asserted reason for her termination was false.  Pl.'s Opp'n at 4.  As a point of clarification, the Court notes that while Ms. Ingram claims to provide evidence of "pretext," a review of her proffered evidence shows that it is more accurately characterized as evidence that goes to her prima facie case—namely, that (1) she had notified her managers at CFSA about her disability, and (2) that she engaged in protected activity by disclosing discriminatory harassment she experienced from Ms. Irving, two basic building blocks of her claims.  This is in contrast to standard pretext evidence, which typically "show[s] both that the reason [provided for an adverse action] was false, and that discrimination was the real reason."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993); *see also Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (listing examples of pretextual evidence, including "the employer's better treatment of similarly situated

employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive.") (citing *Brady*, 520 F.3d at 495 & n.3).

As the District accurately notes, Ms. Ingram has not provided *any* evidence to rebut or contradict her supervisor's accounts of her performance difficulties, or the reports flagging management issues by her supervisees.  Def.'s Reply at 11.  She thus appears to be attempting to defeat summary judgment based only on her prima facie case—a situation that is appropriate only in "exceptional circumstances."  *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007). Such circumstances are not present here.  As a result, even interpreting the evidence in the light most favorable to Ms. Ingram, the Court is unconvinced a reasonable juror would find that Ms. Ingram has met her burden, for the reasons discussed below for each respective claim.

> *a.  Ms. Ingram's Discrimination Claims Do Not Survive Summary Judgment*

Ms. Ingram argues that she can defeat summary judgment by pointing to the disputed "[material] issue regarding the level of awareness of [her] disability" by CFSA.  Pl.'s Opp'n at 5. She contends, invoking both the affidavit of a former colleague, Robert Mays, as well as her own deposition testimony, that her supervisors Ms. Irving and Ms. Muffoletto knew about her anxiety diagnosis.[1]  This is critical, of course, because as this Court has previously explained, Ms. Ingram cannot even establish a prima facie case of discrimination without first showing "that the District regarded her as having such an impairment."  *See Ingram*, 394 F. Supp. 3d at 126 (quoting 42 U.S.C. § 12102(1)); *see also Ellis v. Georgetown Univ. Hosp.*, 723 F. Supp. 2d 42,

---

[1] Ms. Ingram's deficient Statement of Material Facts in Dispute fails to properly address this purported dispute in any respect, and she makes this argument only in her opposition brief.

51 (D.D.C. 2010) (noting that to establish a discrimination claim, "courts require specific evidence that an employer believed an employee's disability substantially limited a major life activity") (citing *Adams v. Rice*, 531 F.3d 936, 945 (D.C. Cir. 2008)).

Ms. Ingram relies on two pieces of evidence to support her claim that her supervisors at the CFSA were aware of her mental health diagnosis. First, she invokes the short, one-page affidavit of Robert Mays, a former CFSA colleague of Ms. Ingram, claiming that his statement "further corroborate[s]" her testimony that she "was indeed discriminated against in her position while her supervisors had knowledge of her condition." Pl.'s Opp'n at 4. But by the Court's reading, the Mays Affidavit does not provide the evidentiary support Ms. Ingram needs, and consequently cannot undermine the District's non-discriminatory explanation for her termination.

The Mays Affidavit states that Mr. Mays is "aware of Tonia Ingram's long-standing mental health diagnosis" and that he has "witnessed Ms. Ingram's anxiety prior to and after this incident." Mays Aff. ¶ 4.[2] The affidavit goes on to note that he is "aware of the stress [Ms. Ingram] endured as a supervisor at CFSA" and that Ms. Ingram experienced familial strain and financial and emotional stress following the "incident" and her termination. *Id.* ¶¶ 5–7. Ms. Ingram claims that these vague statements somehow support her claim that Ms. Irving and Ms. Muffoletto were aware of Plaintiff's disability at the time of her termination and prior to this suit. Pl.'s Opp'n at 4–5.

The Court agrees with the District's observation that "[Mr.] Mays's statement is more noteworthy for what it does not state than what it does." Def.'s Reply at 9. To this point, nothing in Mr. Mays's affidavit suggests that any other CFSA employees—such as Ms.

---

[2] The Court is given no information as to what "incident" Mr. Mays is referencing here.

Muffoletto or Ms. Irving—were aware of Ms. Ingram's "mental health diagnosis," as the statement only speaks to Mr. Mays's personal knowledge of Ms. Ingram's condition. *See* Mays Aff. ¶ 4. Furthermore, Mr. Mays also fails to explain or provide any context as to how be gained this knowledge—was it commonly known in the CFSA office, or did Ms. Ingram confide in him alone? Finally, Mr. Mays's affidavit is also phrased in the present tense, stating only that he is currently "aware of Tonia Ingram's long-standing mental health diagnosis," *id.* ¶ 4, indicating that he may have even come into this knowledge after Ms. Ingram's termination from the CFSA. In short, even giving every reasonable inference to Ms. Ingram, the affidavit simply does not support her contention that "the District was aware of" her mental health issues prior to her termination. Pl.'s Opp'n at 4. At most, it shows that Mr. Mays (at some unknown point, perhaps even post-dating her termination) was aware of her anxiety diagnosis, and that he has seen Ms. Ingram display behaviors typical of this disorder.[3] In sum, the Mays Affidavit provides no support for Ms. Ingram's claims.

Ms. Ingram also references her deposition testimony, stating that she "directly testified that she disclosed her condition to Ms. Irving in 2016." Pl.'s Opp'n at 5 (citing Ingram Dep. Tr. at 184:10-185:18). Ms. Irving represents otherwise in her declaration, stating that "Ms. Ingram never informed me that she was diagnosed with severe anxiety." Decl. of Cherlitheia "Cheryl" Irving ("Irving Decl.") ¶ 40, ECF No. 40-2. As a result, Ms. Ingram asserts that "[Ms.] Irving's purported denial again contributes to a dispute of material fact." Pl.'s Opp'n at 5.

---

[3] Indeed, it almost seems as if Ms. Ingram is reading and drawing conclusions from a completely different document. In her opposition brief she claims that the Mays Affidavit states: "1) the District was aware of Plaintiff's disability before and after the incidents at issue in the case; 2) after disclosing her condition, Plaintiff experienced adverse action that impacted her known anxiety condition; and 3) that Plaintiff suffered significant financial and emotional distress as a result of the actions of the District." Pl.'s Opp'n at 4 (citing Mays Aff.). As already discussed, the content of the Mays Affidavit falls far short of establishing these assertions.

The record, however, tells a different story.  Ms. Ingram did indeed testify that in 2016, around the time of her promotion, that she spoke with Ms. Irving about her anxiety.  She testified that she told her, "you know, I get anxious.  I get anxious at times.  Sometimes it impacts my speech, you know, it may speed up rapidly sometimes.  Nervous.  Even though I know my job. I'm good at what I do.  But I still live with this.  I still deal with it."  Ingram Dep. Tr. at 184:10-16.  She explained that she had the conversation in the context of "tr[ying] to reassure [Ms. Ingram]" that she would be good supervisor.  Ingram Dep. Tr. at 184:20-185:1.  The Court is skeptical that Ms. Ingram's admission that she "gets anxious at times" is sufficient to serve as providing notice to CFSA that she suffered from a diagnosed, clinical anxiety disorder.  Indeed, later in her deposition, Ms. Ingram admits that she never told any of her supervisory staff at CFSA that she had a formal medical diagnosis of anxiety.  Ingram Dep. Tr. at 194:14-17 (" I didn't, I would not go and advertise and say, I have a medical diagnosis, you know.  I didn't speak in those terms."); *see id.* at 195:15 ("I didn't use the medical diagnosis terminology."). She also confirmed that she never disclosed that she was in treatment for anxiety, *see id.* at 196:3, that she was on medication for her condition, *see id.* at 196:12-13, or that she told Ms. Irving that she needed help to do her job because of her anxiety, *id.* at 197:15.  *Compare with Boy v. Gen. Elec. Co.*, 115 F. Supp. 2d 109, 112 (D. Mass. 2000) (finding that plaintiff failed to establish a prima facie case of disability discrimination even where plaintiff told management that he was "taking anti-anxiety medication," as this was insufficient to establish that management knew of his anxiety disorder).

So, by her own admission,  Ms. Ingram conveyed on one occasion to Ms. Irving, over a year prior to her termination, that she "gets anxious at times."  The Court is skeptical that this single interaction—and general phrasing— was enough for Ms. Irving to conclude that Ms.

Ingram had a mental impairment such that it constituted a disability under the ADA and DCHRA, as is required for Ms. Ingram to make a *prima facie* discrimination claim.[4]  This shortcoming is all the more acute given both Ms. Irving's representation that "Ms. Ingram never informed me that she was diagnosed with severe anxiety[,]" Irving Decl. ¶ 40, and Ms. Ingram's failure to conduct discovery which could have directly addressed this issue—such as by deposing Ms. Irving or other CFSA employees to ascertain if they regarded her as suffering from anxiety.

Furthermore, even if the Court were to credit Ms. Ingram's argument that her supervisors regarded her as disabled, no reasonable jury could find that her termination was really the result of illegal discrimination on the basis of her real, or perceived, disability.  This is because Ms. Ingram does not present *any* evidence to dispute the District's legitimate, non-discriminatory reason for her termination— that she was let go due to ongoing performance issues and because her behavior risked child safety.  As a result, she fails to meet her burden of "identify[ing] evidence from which a reasonable jury could find that the [defendant]'s stated reasons were 'phony.'"  *Moeller*, 246 F. Supp. 3d at 140.  The District is accordingly entitled to summary judgment on Ms. Ingram's discrimination claims.

### b. Ms. Ingram's Retaliation Claim Also Fails to Survive Summary Judgment

Ms. Ingram also argues that her DCHRA retaliation claim should survive summary judgment on the grounds that a disputed material issue exists as to whether her termination was an act of retaliation in response to her attempt to report Ms. Irving for discriminatory harassment.  Pl.'s Opp'n at 5–6.  Again, Ms. Ingram's arguments focus only on her ability to establish a prima

---

[4] Pursuant to the ADA Amendments Act of 2008, an employee is protected from adverse action taken by an employer "because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).

facie case—which she seems to again argue is sufficient to overcome the District's legitimate,
non-retaliatory reason for her dismissal and establish pretext.  This is both factually and legally
incorrect, for the reasons described below.

Under the DCHRA, covered employers may not "coerce, threaten, retaliate against, or
interfere with any person in the exercise or enjoyment of, or on account of having exercised or
enjoyed . . . any right granted or protected under this chapter." D.C. Code § 2–1402.61.  As this
Court has explained in the past, to establish a prima facie case of retaliation under the DCHRA,
Ms. Ingram must show: (1) that she opposed or complained about a discriminatory employment
practice (*i.e.* engaged in a "protected activity"); (2) that the District took an adverse employment
action against her; and (3) that there exists a causal link between the protected activity and the
employment action.  *See Shady Grove,* 496 F. Supp. 3d at 373 (citing *Propp v. Counterpart Int'l,*
39 A.3d 856, 863 (D.C. 2012)).  For purposes of the first element, which the District argues is
absent here, "protected activity[ ] includes opposing or complaining about a practice that one
reasonably believes to be unlawfully discriminatory."  *Id.*

Ms. Ingram argues that she has at least established a material dispute regarding "whether
or not her termination was a retaliatory action."  Pl.'s Opp'n at 6.  This, however, presupposes
that Ms. Ingram engaged in protected activity in the first place sufficient to make out a prima
facie retaliation claim.  And evidence to this effect is plainly lacking.  Ms. Ingram asserts in her
Statement of Material Facts in Dispute that she "engaged in protected activity when she
attempted to contact her HR department component regarding the harassment she experienced
from [Ms. Irving]," and that she "also engaged in protected activity on or around December 21,
2017 when she disclosed her allegations of harassment to another supervisor, Ms. Muffaletto."
Pl.'s SMF ¶¶ 2–3.  But both of these statements are provided absent any actual citations to the

record, as required.  Furthermore, upon the Court's examination of the record, it finds neither

assertion to be borne out by the facts.

 Beginning with Ms. Ingram's "attempt" to contact Human Resources, this fact is

supported in Ms. Ingram's briefing by only a single record citation to her response to the

District's Interrogatory No. 6.  The response states:

> "I attempted to speak with Nina Page, Director of HR but she mentioned
> that she was not available to meet with me.  Before I could reschedule, I was
> terminated . . .The HR manager, Shawn Winslow spoke with Nina Page and told
> her about my concerns of getting fired.  I was present when he made the phone
> call but unfortunately, she was not available."

Pl.'s Resp. to Def.'s First Int. at 7.  This same assertion is repeated, almost verbatim, in

Ms. Ingram's affidavit.  *See* Aff. of Tonia Ingram ("Ingram Aff.") ¶ 1, ECF No. 41-1.

First, the Court notes that despite Ms. Ingram's effort to quickly gloss over this point, an

"attempt" to engage in protected activity is not the same as actually engaging in protected

activity under the DCHRA.  As a matter of law, to establish activity that is considered

"protected" under the DCHRA, an employee must do more than simply object to "mistreatment

in general, without connecting it to membership in a protected class." *Vogel v. D.C. Off. of

Planning*, 944 A.2d 456, 464 (D.C. 2008) (citations omitted).  As a result, "[w]hile no "magic

words" are required, the complaint must "in some way allege unlawful discrimination" to

adequately make the defendant aware of the protected activity.  *Broderick v. Donaldson*, 437

F.3d 1226, 1232 (D.C. Cir. 2006) (finding that complaint of "embar[r]assing, humiliating and

downright insulting" behavior does not constitute protected activity where plaintiff did not allege

that she was being retaliated or discriminated against); *Chandamuri v. Georgetown Univ.*, 274 F.

Supp. 2d 71, 84 (D.D.C. 2003) (finding student complaint insufficient to constitute protected

activity where complaint only stated that professor treated him "unfairly" and differently from

other "similarly situated" students, not that he experienced unlawful discrimination on the basis

of race and national origin); *Howard Univ. v. Green*, 652 A.2d 41, 46–47 (D.C. 1994) (holding plaintiff did not engage in protected activity when she complained of workplace favoritism, and only later claimed sexual orientation discrimination).

By Ms. Ingram's own telling, she never shared with Human Resources that she felt she was a victim of discrimination. She only "attempted to speak with Nina Page, Director of HR" but she was unavailable, and then Ms. Ingram was terminated before she could meet. Pl.'s Resp. to Def.'s First Int. at 7; Ingram Aff. at 3. Ms. Ingram also represents that "[t]he HR manager, Shawn Winsow[,] spoke with Nina Page and told her about my concerns." *Id.* But at Ms. Ingram's own deposition she went on to clarify that while she told Mr. Winslow about Ms. Irving's poor treatment of her and concerns that she was about to be fired, she specifically withheld from him any information about her disability, noting "[t]hat was for Ms. Page." Ingram Dep. Tr. at 44:4-18. Accordingly, Mr. Winslow (and Ms. Page) could know only what Ms. Ingram told them—and by her own account she did not share that she believed that she had been subject to discrimination due to her disability. *See, e.g., Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 727–28 (7th Cir. 2003) (employee's complaint of being "picked on" determined to not constitute protected activity where employee did not say that "sex discrimination was her real problem"). The evidence thus cannot support that Ms. Ingram's communications with CFSA's Human Resources constituted protected activity.

Ms. Ingram also asserts that she engaged in protected activity when she "disclosed her allegations of harassment to another supervisor, Ms. Muffaletto." Pl.'s SMF ¶ 3. But general mistreatment is not the same as harassment on the basis of one's disability status. And Ms. Ingram herself admitted at her deposition that she never stated that she viewed Ms. Irving's actions as discrimination or told Ms. Muffaletto that she was being targeted by Ms. Irving

because of her health status.  *See* Ingram Dep. Tr. at 227:17-22 ("I didn't use the word discrimination.  What I mentioned to her was . . . that I need to be removed [from Ms. Irving's supervision].  I just can't function.  It's just not good for me."); *see also id.* at 228:6-8 (admitting that, "I didn't go to [Ms. Muffaletto] and say . . . she's singling me out because I have anxiety."). Ms. Muffaletto has also submitted a sworn affidavit stating that "[i]n all my communications with Ms. Ingram, I never understood her to be raising a concern that she was being discriminated against based on a disability or that she was requesting assistance or accommodation of any kind based on a disability; rather, I always understood her complaints to be directly related to the nature of Ms. Irving's supervision of her work and disagreements over how to handle investigations."  Muffoletto Decl. ¶ 23.  The Court thus concludes that no material dispute of fact remains, as the record does not indicate that Ms. Ingram engaged in protected activity, and accordingly she cannot even make out a *prima facie* case of retaliation.

Moreover, even assuming Ms. Ingram did indeed engage in protected activity such that she had a potentially viable retaliation claim, the Court finds that no reasonable jury could infer from the evidence here that her termination was an act of retaliation.  This is because she cannot overcome the legitimate, non-retaliatory reason offered by the District to explain Ms. Ingram's termination— that she violated agency protocols and was a poor manager.  In arguing for the existence of pretext to overcome this rationale, Ms. Ingram is only able to point to the temporal proximity between having (attempted) to make her complaint about Ms. Irving to Human Resources, and her termination roughly four months later.  But where, as here, an employer has provided a legitimate, nonretaliatory reason for its employment action, "positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanation[ ] [is] genuine." *Durant v. D.C. Gov't*, 875 F.3d 685, 700 (D.C. Cir. 2017) (quoting *Talavera v. Shah*,

638 F.3d 303, 313 (D.C. Cir. 2011)); *see also Iyoha v. Architect of the Capitol*, 927 F.3d 561,

574 (D.C. Cir. 2019) (explaining that "mere temporal proximity" without more cannot establish

retaliation, because otherwise "protected activities would effectively grant employees a period of

immunity, during which no act, however egregious, would support summary judgment for the

employer in a subsequent retaliation claim.").  As a result, the Court concludes that in light of all

the evidence, Ms. Ingram has failed to a create a material dispute as to whether the District

retaliated against her.  Accordingly, the District is entitled to summary judgment on this claim as

well.

## VI.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 40) is

**GRANTED**.  An order consistent with this Memorandum Opinion is separately and

contemporaneously issued.

Dated:  July 30, 2021                                                            RUDOLPH CONTRERAS
                                                                                          United States District Judge